THOMAS, Judge.
 

 On November 6, 2008, Missy Wilson, an employee of the Mobile County district attorney’s office, petitioned the Mobile Probate Court, seeking the involuntary commitment of Leslie Mason. According to the petition, Mason had telephoned Wilson’s office number and had left messages indicating that she was suffering from a mental illness and that she desired to commit suicide. The petition recounted the details of a conversation that Mason had had with the district attorney’s office personnel on November 3, 2008, indicating that a doctor was going to rape and kill her, that this doctor had put razors and “goat stickles” in her stomach, and that “sometimes I want to kill myself but not now”; the petition also recounted the details of a telephone message in which Mason had stated “I want to kill myself; please help me” and had accused the doctor of raping her. As a result of the last message, Mason had been taken to a local hospital. Attached to the petition and later admitted as evidence during the probable-cause hearing was a four and a half page letter from Mason to the Mobile Police Department in which she recounted in detail several serious and bizarre allegations against a Georgia doctor.
 

 The probate court entered an emergency order on November 6, 2008, placing Mason in the custody of Altapointe Health Systems’ Probate Court Evaluation Unit. After a probable-cause hearing on November 12, 2008, the probate court determined that Mason posed a threat to herself or to others and ordered her detained and treated until the hearing on the merits of the commitment petition, which was set for November 18, 2008. After the hearing on the merits of the petition, the probate court ordered Mason committed to the custody of the State, specifically to Searcy
 
 *152
 
 Hospital, for a period not to exceed 150 days. Mason appeals from that order.
 

 By joint motion granted by the probate court, the evidence and testimony at the probable-cause hearing was to be considered at the merits hearing as if adduced at that hearing. In sum, the evidence at both hearings reflected that Mason suffers from delusions regarding the Georgia doctor, who she alleges, in the letter attached to the petition, (1) has enrolled her in an egg-harvesting program without her consent; (2) has raped and sodomized her on several occasions; (3) has implanted blades in her chest and abdominal cavities and implanted what she calls “goat sticks” or “horse sticks,” which she appears to believe result in the implantation of animal fetuses, in her abdominal cavity; and (4) has threatened her life if she exposed him.
 

 At the November 18, 2008, hearing on the merits of the petition, Joyce Barber, a representative of the Adult Evaluation Team at Altapointe, testified regarding the evaluation of Mason. Barber stated that Mason had been diagnosed as suffering from paranoid schizophrenia and that she had been placed on a medication named “Geodon.” Barber testified that, as recently as the day before the hearing, Mason had continued to suffer from delusions about the Georgia physician, including her belief that she was enrolled in an egg-harvesting program and that the Georgia physician had implanted “goat sticks” during this program. Barber noted that Mason continued to be paranoid and that she had indicated, only the day before the hearing, that she wanted to commit suicide. According to Barber, Mason had not shown a response to the medication and continued to be actively delusional despite its administration.
 

 Barber testified that Mason’s earlier medical records had indicated that she had been seen by a Mobile physician in November 2008 and that he had found no reason for the abdominal pain of which she complained. According to Barber, earlier medical records indicated that Mason had suffered from major depressive disorder with psychotic features in the past several years. Those records, according to Barber, indicated that Mason had been hospitalized in Augusta, Georgia, in 2005, 2006, and 2007.
 

 When asked if Mason posed a risk of harm to herself or to others, Barber explained again that the concern was that Mason would act on her repeated desire to commit suicide or to perhaps strike out at the Georgia physician that she had accused of harming her. Although Barber admitted that Mason had not been violent on the unit during her approximately 10-day confinement, Barber noted that Mason’s active belief that the situation she described was occurring could result in action based on those beliefs. Barber testified that Mason did not believe herself to be mentally ill, which Barber said made it impossible for Mason to make rational, informed decisions about the necessary treatment for her condition. Without treatment, said Barber, Mason’s mental health would deteriorate. Because of Mason’s lack of insight into her illness and her inability to make rational and informed decisions about treatment, Barber opined that commitment was the least restrictive means to administer to Mason the necessary treatment for her mental illness.
 

 Commitment proceedings are governed by the procedures outlined in Ala.Code 1975, § 22-52-1 et seq. See Webster
 
 v. Bartlett,
 
 709 So.2d 1226 (Ala.Civ.App.1997) (holding that both original commitment proceedings and renewal proceedings are governed solely by Alabama statutory law). To have properly committed Mason to inpatient treatment, the probate court must have found clear and convincing evi
 
 *153
 
 dence of each of the following elements: (1) that Mason “is mentally ill”; (2) that Mason “poses a real and present threat of substantial harm to self and/or others”; (3) that Mason “will, if not treated, continue to suffer mental distress and will continue to experience deterioration of the ability to function independently”; and (4) that Mason “is unable to make a rational and informed decision as to whether or not treatment for mental illness would be desirable.” Ala. Code 1975, § 22-52-10.4(a).
 

 Mason relies on this court’s opinion in
 
 Ryan v. Bartlett,
 
 802 So.2d 1082 (Ala.Civ.App.2001), in which we reversed the re-commitment to inpatient treatment of Stephen Ryan because of the lack of proof that Ryan was a danger to himself or others. Ryan had been confined for purposes of treatment for a four-month period, during which he had been compliant with his treatment regimen and had not exhibited any overt signs that he would be a danger to himself or to others.
 
 Ryan,
 
 802 So.2d at 1084.
 

 “Ryan’s treating psychologist, Dr. Euse-bio Respicio, had testified that it was ‘a possibility’ that Ryan, if he thought certain people were conspiring against him, could ‘call and threaten’ or might attempt to ‘hit’ those people.
 
 Ryan,
 
 802 So.2d at 1083. However, Dr. Respicio testified that Ryan had not acted in a violent manner or made any threats during his four-month commitment to Sear-cy Hospital; Dr. Respicio also testified that he had no record of Ryan having hit anyone in the past or that Ryan had ever been criminally charged with assaulting or threatening anyone.
 
 Id.
 
 at 1084. Dr. Respicio further testified that Ryan could function in a coherent and calm manner in situations unrelated to his paranoid delusions and that ‘Ryan “really can keep it to himself. He doesn’t show evidence like [acting out or committing overt acts of violence].” ’
 
 Id.
 
 Thus, we concluded that Dr. Respicio’s testimony that Ryan ‘might,’ under some circumstances, threaten other persons when there was no evidence indicating that he had ever acted in a violent manner was insufficient to establish that Ryan posed a substantial danger to himself or to others, and, therefore, we held that the hospital had failed to prove that his recommitment was necessary as required by the statute.
 
 Id.”
 

 Collins v. Williams,
 
 967 So.2d 91, 93 (Ala.Civ.App.2007) (explaining the rationale for reversal of the recommitment in
 
 Ryan).
 

 Wilson argues that the present case, which is an original commitment proceeding as opposed to a recommitment proceeding like the one at issue in
 
 Ryan,
 
 is distinguishable from
 
 Ryan.
 
 She relies on
 
 Collins,
 
 in which this court distinguished
 
 Ryan. Collins,
 
 967 So.2d at 92. The facts of
 
 Collins
 
 are closely akin to those of the present case.
 

 Collins had been confined for six days for evaluation after an incident during which he had brandished a gun during an argument with his brother.
 
 Id.
 
 The attending psychiatrist at the unit at which Collins had been evaluated, Dr. Douglas Ewing, testified that Collins was in need of further evaluation of his psychotic symptoms so that it could be determined whether he had experienced a “ ‘first psychotic episode.’ ”
 
 Id.
 
 Collins had exhibited signs of paranoia for months before the incident involving the weapon, and he had a family history of schizophrenia.
 
 Id.
 
 According to Dr. Ewing, the observation team was not ready to diagnose Collins yet, in part because he had admitted regular use of marijuana before his confinement and the team had not placed him on medication in order to determine whether the symptoms would improve once Collins had stopped using marijuana.
 
 Id.
 
 Dr. Ewing testified that
 
 *154
 
 there was a “ ‘distinct possibility1 ” that Collins was a danger to himself or to others, in part because of the precipitating weapon incident, because Collins had shown little insight regarding the event leading up to his confinement, and because Collins could not make rational, informed decisions about his need for mental-health treatment.
 
 Id.
 
 Dr. Ewing further opined that, without treatment, Collins “would continue to suffer from mental illness and would experience a deterioration of his ability to function independently.”
 
 Id.
 

 As we explained in
 
 Collins,
 
 the four-month period during which Ryan had been confined under the original commitment order and his compliance with his treatment regimen during his confinement were major distinguishing factors between the factual situations in
 
 Ryan
 
 and in
 
 Collins.
 

 “We agree with Williams that
 
 Ryan
 
 is distinguishable from the present case. In
 
 Ryan,
 
 Ryan had been in treatment at Searcy Hospital for approximately four months, during which he had not exhibited any violent behavior.
 
 Id.
 
 Although violent behavior or ‘threats’ were possible reactions that Ryan could have once he were released, the hospital had no evidence indicating that Ryan had ever harmed anyone and could not rely on mere possibilities to restrain Ryan of his liberty.
 
 Id.”
 

 Collins,
 
 967 So.2d at 93.
 

 We concluded in
 
 Collins
 
 that the petitioner had presented clear and convincing evidence to support the probate court’s conclusion that Collins suffered from a mental illness; that he was unable to make an informed and rational decision concerning his need for treatment; that, without treatment, he would suffer continued deterioration; and that, because of his mental illness, he posed a real and present threat of substantial danger to himself and to others.
 
 Id.
 
 We affirmed the probate court’s commitment of Collins.
 
 Id.
 

 In the present case, the evidence indicates that Mason suffers from delusions and has been diagnosed as a paranoid schizophrenic. Although treatment for her illness was instituted during her 10-day confinement before the hearing on the merits of the petition, Mason had not responded favorably to the medication prescribed because she continued to be paranoid, to suffer from delusions, and to make threats that she would commit suicide over the delusions from which she suffered. Although she had not acted on her threat by becoming violent on the unit or by actually attempting suicide, the 10-day period during which Mason had been confined was a short span of time during which she had been closely monitored. Based on her diagnosis of paranoid schizophrenia and her continued threats to harm herself, her continued delusions, and other symptoms of her mental illness, the probate court had ample evidence indicating that Mason is mentally ill and that she poses a substantial threat of harm to herself and possibly to others. Because Mason does not believe she suffers from a mental illness, the probate court properly concluded that she is unable to make a rational, informed decision to seek necessary treatment, which the evidence indicates she needs in order to prevent further deterioration of her mental health. We affirm the probate court’s judgment involuntarily committing Mason to inpatient treatment at Searcy Hospital.
 

 AFFIRMED.
 

 THOMPSON, P.J., and PITTMAN, BRYAN, and MOORE, JJ., concur.